Rebecca A. ROWE, Plaintiff,

v.

CITY & COUNTY OF SAN FRANCISCO, et al., Defendants.

No. C 00–03676 BZ.

United States District Court, N.D. California.

Feb. 13, 2002.

Richard M. Rogers, Mayo & Rogers, San Francisco, CA, for Plaintiff.

Dennis J. Herrera, Linda M. Ross, Sallie P. Gibson, City Atty's Office, San Francisco, CA, for defendants.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ZIMMERMAN, United States Magistrate Judge.

Before the court is defendant City and County of San Francisco's ("City's") motion for summary judgment on plaintiff Rebecca Rowe's claims under both the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA") and California's Fair Employment and Housing Act, Cal. Gov't Code §§ 12900 *et seq.* ("FEHA").[1] Plaintiff alleges that defendant discriminated against her on the basis of her disability by denying her a reasonable accommodation through reassignment to a different position. For the reasons set forth below, defendant's motion is denied.[2]

Plaintiff began working for the City's Municipal Transportation Agency ("MUNI") as a 9163 Transit Operator in June of 1979. On September 22, 1997, plaintiff was taken off work due to complications resulting from an industrial injury she suffered on April 15, 1997. Specifically, plaintiff suffered from lower back pain and disc herniations. Plaintiff also developed problems in her right hand due to carpal tunnel syndrome and arthritis. Rowe's treating physician, Dr. Dominic Tse, recommended at this time that she not return to work as a Transit Operator due to her lower back and wrist conditions. In late April of 1998, Rowe returned to work and was temporarily assigned to office work. Shortly thereafter, on May 8, 1998, Rowe formally requested a job transfer as a reasonable accommodation due to her medical condition.

On August 28, 1998, Rowe's temporary office assignment ended. Thereafter, she was not working while awaiting a job transfer pursuant to her request. In need of a source of income for her family, and having received no accommodation, Rowe retired on December 1, 1998 so she could receive her pension. On April 9, 1999, defendant closed plaintiff's file after it determined that she was not a qualified individual with a disability entitled to reasonable accommodation under the ADA.

After filing complaints with both the Equal Employment Opportunity Commission ("EEOC") and the Department of Fair Employment and Housing ("DFEH"), plaintiff filed this lawsuit. Defendant now moves for summary judgment on the ground that it cannot be liable for a failure to accommodate because plaintiff was responsible for a breakdown in the interactive process. Alternatively, defendant argues that no reasonable accommodation

---

1. The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings including entry of final judgment pursuant to 28 U.S.C. § 636(c).

2. Because ADA law interpreting the parties' obligations under the reasonable accommodation process has been applied to claims under the FEHA, the same analysis of the interactive process and the availability of a vacant position will apply to defendant's summary judgment motion for both claims. *See Jensen v. Wells Fargo Bank,* 85 Cal.App.4th 245, 262–63, 102 Cal.Rptr.2d 55 (2000). In preparing for trial, the parties should be mindful that the California Supreme Court is reviewing the retroactive application of Cal. Gov't Code § 12926(k)(1)(B)(ii)(West Supp.2001), which amended the definition of an individual with a disability under FEHA to one that "limits," rather than "substantially limits," a major life activity. *See Colmenares v. Braemar Country Club, Inc.,* 107 Cal.Rptr.2d 719, *review granted and opinion superseded,* 111 Cal.Rptr.2d 336, 29 P.3d 797 (Cal. Aug. 22, 2001); *Wittkopf v. Los Angeles,* 109 Cal.Rptr.2d 543, *review granted and opinion superseded,* 113 Cal. Rptr.2d 23, 33 P.3d 446 (Cal. Oct. 10, 2001). For example, if the Court holds that the statute applies retroactively, then there may exist questions as to the appropriateness of defendant's inquiries to Dr. Tse whether plaintiff's medical condition "substantially limits" plaintiff's major life activities.

through reassignment was possible prior to plaintiff's retirement.[3]

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if a reasonable jury could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court does not make credibility determinations or weigh conflicting evidence, and views the evidence in the light most favorable to the nonmoving party. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–631 (9th Cir.1987)(citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

■ Title I of the ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a)(West 1995). The ADA specifies a number of actions that constitute discrimination, including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless

such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A).

The implementing regulations of the ADA state that in determining the appropriate reasonable accommodation, "it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3)(2001). The Ninth Circuit recently joined the majority of other circuits when it held that "the interactive process is a mandatory rather than a permissive obligation on the part of employers under the ADA and that this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir.2000), *cert. granted on other grounds*, 532 U.S. 970, 121 S.Ct. 1600, 149 L.Ed.2d 467 (2001). *See also Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 315 (3d Cir. 1999); *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir.1999); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir.1999); *Beck v. Univ. of Wisconsin*, 75 F.3d 1130, 1135 (7th Cir. 1996); *Taylor v. Principal Fin. Group Inc.*, 93 F.3d 155, 165 (5th Cir.), *cert. denied*, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996).

---

**3.** Defendant has not moved for summary judgment on the grounds that plaintiff is not a "qualified individual with a disability" under the ADA or FEHA. In preparing for trial, however, the parties should be mindful of the Supreme Court's recent ADA decision in *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The

Court held that "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 693.

■ In *Barnett*, the Ninth Circuit thoroughly examined the nature and scope of the interactive process between an employer and an employee seeking reasonable accommodations. It found that the process requires good faith communication by both parties as a means of achieving the shared goal of identifying an accommodation that would enable an employee to perform her job effectively. *See Barnett*, 228 F.3d at 1114. An employee's request for a reasonable accommodation may use "plain English" and "need not mention the ADA or use the phrase 'reasonable accommodation.'" *Barnett*, 228 F.3d at 1112 (quoting *EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, EEOC Compliance Manual (CCH), § 902, No. 915.002 (March 1, 1999), at 5438). According to the court, "[b]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process." *Id.* at 1114–15. *See also Beck*, 75 F.3d at 1135 ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."). In defining the judiciary's role in evaluating the parties' participation in the interactive process, the Ninth Circuit stated that " 'courts should attempt to isolate the cause of the breakdown [in the interactive process] and then assign responsibility' so that '[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown.' " *Id.* at 1115 (quoting *Beck*, 75 F.3d at 1135–37). The Ninth Circuit concluded that U.S. Air failed to engage in the interactive process, holding that:

> [E]mployers, who fail to engage in the interactive process in good faith, face

liability for the remedies imposed by the statute if a reasonable accommodation would have been possible. We further hold that an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process.

*Barnett*, 228 F.3d at 1116.

■ Viewing the evidence in the light most favorable to the plaintiff, there exists a genuine dispute as to which party was responsible for the breakdown in the interactive process. It is undisputed that plaintiff formally put defendant on notice of her medical condition and desire for a job transfer as a reasonable accommodation in early May of 1998. Dr. Tse then sent a letter on June 8, 1998, describing plaintiff's condition as permanent and stationary and precluding her from returning to work as a Transit Operator. His letter stated in part:

> The condition has been permanent and stationary. The main residual relates to her lower back, which would preclude her from returning to her usual job as a Muni operator, and she should be considered as a Qualified Injured Worker. On a prophylactic basis, her hand condition also precludes her from returning to her usual job as a Muni operator.

(Decl. of Sallie Gibson in Supp. of Def.'s Mot. for Summ. J., Ex. C ("Tse Dep."), Ex. I.) By this point, if not in early May, the interactive process had been triggered, and defendant had a good faith duty to process plaintiff's request for a reasonable accommodation. *See Taylor*, 184 F.3d at 313–14 (interactive process triggered when defendant had notice, due to undisputed background information, that plaintiff "might have a disability"); *Fjellestad*, 188 F.3d at 952 (same).[4]

---

4. As the Third Circuit stated:

> What matters under the ADA are not formalisms about the manner of the request,

Plaintiff introduced evidence that the City could not locate her first request for accommodation and appears to have lost it. The City does not deny that it cannot locate the request for accommodation. However, the City claims it had begun the interactive process, and on June 22, 1998 had sent Dr. Tse a health provider certification form to complete. Neither the City nor Dr. Tse possess a copy of this request. More significantly, the City does not appear to have told Rowe what it was doing, despite her repeated attempts to contact Deborah Quinn–Carpenter, the Assistant Director of MUNI's EEO division in charge of evaluating applications for reasonable accommodation, through a series of voice mail messages. While there is a dispute whether there was any communication between the parties during the summer of 1998, both sides agree that the first discussion on this issue occurred on August 28, 1998 when plaintiff accidentally encountered Quinn–Carpenter in an elevator.[5]

During this chance encounter, Quinn–Carpenter informed plaintiff that she had not yet received the certification form from Dr. Tse, and provided plaintiff with another certification form which plaintiff promptly delivered to Dr. Tse on August 31, 1998. Apparently in response to a letter from plaintiff on September 11,

1998, plaintiff and Quinn–Carpenter next met on September 18, 1998 to discuss plaintiff's request for accommodation. (Decl. of Sallie Gibson in Supp. of Def.'s Mot. for Summ. J., Ex. A ("Rowe Dep."), Ex. O at 1–2.) At this time, Quinn–Carpenter assisted plaintiff in filling out a second request for accommodation. At no time did defendant review plaintiff's medical records or have plaintiff examined by another doctor.

Meanwhile, Dr. Tse filled out the certification form on September 4, 1998. The first section asks:

> Does this person have a disability which "substantially limits" one or more of his/her major life activities? The major life activity/activities affected is/are:
>
> ☐ Walking ☐ Talking ☐ Breathing ☐ Performing Manual Tasks ☐ Seeing ☐ Working ☐ Hearing ☐ Learning ☐ Caring for Oneself ☐ Other:_____

(Tse Dep., Ex. K.) Dr. Tse testified that he was confused about how to fill out the form. (Tse Dep. at 66:9–14.) For example, Dr. Tse believes that while plaintiff could walk, she could not walk far. (*Id.* at 83:10–84:17.) While his testimony is not always clear, (*id.* at 42:4–22), it appears he was uncertain as to whether, from a legal perspective, this meant she was substantially limited. In any event, he avoided checking any of the boxes [6] and opted in-

---

but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.

*Taylor*, 184 F.3d at 313.

**5.** The parties dispute the activity that occurred between June 8, 1998 and August 28, 1998. According to defendant, Quinn–Carpenter actively pursued Rowe's application once she learned that Rowe's condition was permanent and stationary. For example, Quinn–Carpenter claims that she sent out a health provider certification form to Dr. Tse

on June 22, 1998, and followed up on the status of this form by leaving messages with both Rowe on July 14, 1998, and Dr. Tse on July 15, 1998. Further, Quinn–Carpenter has no recollection of any voice mail messages left from plaintiff. According to plaintiff, neither she nor Dr. Tse ever received a message from Quinn–Carpenter, and Dr. Tse has no record of the certification form allegedly sent to him in late June.

**6.** Although Dr. Tse did check off the box marked "Other", he later notified Quinn–Carpenter that this was a mistake and his answer was contained in the medical information he provided. (Tse Dep., Ex. T.)

stead to explain plaintiff's medical condition as follows:

> [P]ersistent low back pain precludes heavy lifting, repeated bending, had bilateral carpal tunnel syndrome, with surgery, having good result, but still should avoid extensive or heavy repetitive hand activities.

(*Id.*) In response to how the accommodation was related to plaintiff's medical condition, Dr. Tse wrote that "low back pain precludes her from prolonged sitting." (*Id.*) Lastly, Dr. Tse indicated that the accommodation would remove barriers to plaintiff's performance by providing "more freedom in her body position and movement." (*Id.*)

The record is not clear what Dr. Tse did with the completed form. Quinn–Carpenter wrote to Dr. Tse on September 30, 1998, requesting that he fill out the certification form. It is undisputed that the certification form was sent to defendant on October 9, 1998. After receiving the form, Quinn–Carpenter wrote to plaintiff on October 26, 1998, informing her that Dr. Tse's certification was incomplete, without explaining why. This was the last time Rowe heard from the City until February of 1999. She also wrote to Dr. Tse on October 27, 1998, requesting more information regarding his apparent checkoff of the "Other" box for major life activities affected. Dr. Tse sent an eight page report to plaintiff's workers' compensation attorney on November 6, 1998, providing greater detail regarding plaintiff's medical condition. The report again referred to Rowe's condition as "permanent and stationary," and stated that "[t]here is disability precluding heavy work" and "[s]he is a qualified injured worker, unable to engage in her usual and customary occupation as a

Muni operator." (Tse Dep., Ex. Q at 7.) Doctor Tse sent this report to defendant on December 18, 1998. On February 26, 1999, Quinn–Carpenter sent another letter to Dr. Tse requesting clarification on his September 4, 1998 certification. Dr. Tse immediately responded on March 1, 1999, by referring Quinn–Carpenter back to the description of plaintiff's limitations on the original certification form. (Tse Dep., Ex. T.)

Viewing these facts in this light, a reasonable jury could conclude that plaintiff was not responsible for the breakdown in the interactive process and that defendant should have more effectively communicated with plaintiff and Dr. Tse.[7] Focusing on the first months following May 8, 1998, defendant does not appear to have ever personally advised the plaintiff that it needed further medical information to process her request. Plaintiff first learned that this was an issue by virtue of a chance encounter with Quinn–Carpenter in late August. Within days, she had presented a new certification form to Dr. Tse and he had completed it. It is unlikely that a jury would conclude that if Rowe had been advised in June of the City's need she would not have acted as promptly.

Nor is this case like *Tatum v. Hospital of the Univ. of Pa.*, 57 F.Supp.2d 145 (E.D.Pa.1999), on which defendant relies for the proposition that an employee who does not supply the employer with needed medical information is responsible for the breakdown of the interactive process. *See id.* at 149. Unlike *Tatum*, in which the only support for the asserted disability was a note on a doctor's prescription pad stating that the plaintiff, a nurse, was "unable to lift or pull heavy patients," *id.* at

---

7. Part of the communications problem may have been that the early communications between defendant and Dr. Tse about plaintiff's ADA claim were made by defendant in the context of plaintiff's workers' compensation claims and through defendant's claims adjuster or plaintiff's workers' compensation lawyer.

147, in this case the City was or should have been aware of the approximately one year's worth of medical complications the plaintiff had experienced following her industrial injury and that she had been on temporary disability for some substantial time.[8] In addition, defendant had various letters and forms Dr. Tse had provided. While they did not clearly state a legal conclusion as to whether the plaintiff was "substantially limited" in her major life activities, they did provide the City with a substantial amount of medical information about her condition. Yet the City never appears to have made its *own* determination of whether her disability required an accommodation. A jury could well conclude that regardless of how clear the medical information was that the plaintiff was disabled, the City was not going to do anything until Dr. Tse checked a box, and that this was an obstructionist tactic on behalf of the City.

The City disputes a number of these facts. Among other things, the City denies that it lost the original request for accommodation, claims that it requested further information from Dr. Tse in late June and in July, claims that it tried to call plaintiff during July but was unable to reach her and denies that plaintiff tried to contact the City during August. Assuming these disputed facts are material, their existence further supports denial of defendant's motion.

 Defendant alternatively argues that even if the interactive process did not break down due to plaintiff's bad faith, the reasonable accommodation of a job transfer was not available between September 4, 1998, when Dr. Tse signed the certification, and December 1, 1998, when Rowe retired. "[T]he task of proving ... that no reasonable accommodation was available rests with an offending employer throughout the litigation, and ... given the difficulty of proving such a negative, it is not likely that an employer will be able *to* establish on summary judgment the absence of a disputed fact as to this question." *Morton v. United Parcel Serv.*, 272 F.3d 1249, 1256 n. 7 (9th Cir.2001)(emphasis in original). *See also Taylor*, 184 F.3d at 318 ("When an employee has evidence that the employer did not act in good faith in the interactive process, however, we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect."). When making the determination of whether a reasonable accommodation was possible, "the jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations." *Barnett*, 228 F.3d at 1115–16 (quoting *Taylor*, 184 F.3d at 317–18). Here, it is undisputed that Rowe qualified for a transfer into an Information Clerk or Traffic Checker position, and that fifteen such positions were filled between June 8, 1998 and September 3, 1998. (Joint Statement of Undisputed Facts ¶ 47.) A reasonable trier of fact could conclude that had defendant participated in good faith beginning in May 8, 1998, a reasonable accommodation would have been available to Rowe.

---

8. Defendant argues that it legally could not review its workers' compensation medical file to determine if plaintiff was disabled. Although "an employer cannot ask an employee for documentation unrelated to establishing the existence of a disability and the necessity of accommodation," *Barnett*, 228 F.3d at 1115 n. 6, it surely has the ability to review an employee's record for more information concerning the employee's medical condition in determining whether she possesses a disability and requires an accommodation. *See* Cal. Lab.Code § 3762(c)(Deering Supp.2002)(third party administrator of employee's workers' compensation claim can disclose "medical information ... that is necessary for the employer to have in order for the employer to modify the employee's work duties.").

Accordingly, **IT IS HEREBY OR-DERED** that defendant's motion for summary judgment is **DENIED.**